# E-filing

JOSEPH P. RUSSONIELLO (CABN 44332)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

JOSHUA HILL (CABN 250842)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, CA 94612
    Telephone: (510) 637-3740
    Facsimile: (510) 637-3724
    Email: Joshua.Hill2@usdoj.gov

Attorneys for the United States

**FILED**

NOV 1 8 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 09 - 70976 |
| Plaintiff, | |
| v. | NOTICE OF PROCEEDINGS ON OUT-OF-DISTRICT CRIMINAL CHARGES PURSUANT TO RULES 5(c)(2) AND (3) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE |
| JOHN JOSEPH O'SHEA, | |
| Defendant. | |

    Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal Procedure that on or about November 18, 2009, the above-named defendant was arrested based upon an arrest warrant (attached) issued in case number 4:09-CR-629 in the Southern District of Texas upon an Indictment (attached).

    Defendant is charged in count one with a violation of 18 U.S.C. § 371 (Conspiracy), in counts two through thirteen with violations of 15 U.S.C. §§ 78dd-2(a) and 2 (Foreign Corrupt Practices Act), in counts fourteen through seventeen with violations of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (International Money Laundering), and in count 18 with a violation of 18 U.S.C. §§ 1519 and 2 (Falsification of Records in a Federal Investigation).

**Maximum Penalties**

18 U.S.C. § 371 (Count 1)
5 years of imprisonment
3 years of supervised release
$250,000 fine or two times profits or losses
$100 special assessment

15 U.S.C. § 78dd-2(a) (Counts 2-13)
5 years of imprisonment
3 years of supervised release
$100,000 fine or two times profits or losses
$100 special assessment

18 U.S.C. § 1956(a)(2)(A) (Counts 14-17)
20 years of imprisonment
3 years of supervised release
$500,000 fine or two times profits or losses
$100 special assessment

18 U.S.C. § 1519 (Count 18)
20 years of imprisonment
3 years of supervised release
$250,00 fine or two times profits or losses
$100 special assessment

Date: November 18, 2009

Respectfully Submitted,

JOSEPH P. RUSSONIELLO
UNITED STATES ATTORNEY

JOSHUA HILL
Assistant U.S. Attorney



United States Courts
Southern District of Texas
FILED

NOV 1 6 2009

Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CRIMINAL NO. H-09 - 629 |
| Plaintiff, | § | |
| | § | |
| v. | § | **Violations** |
| | § | 18 U.S.C. § 371 (Conspiracy) |
| JOHN JOSEPH O'SHEA, | § | 15 U.S.C. §§ 78dd-2 |
| Defendant. | § | (Violation of the FCPA) |
| | § | 18 U.S.C. § 1956 (International |
| | § | Money Laundering) |
| | § | 18 U.S.C. § 1519 (Falsification of |
| | § | Records in a Federal |
| | § | Investigation) |

## INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment, unless otherwise specified:

## COUNT ONE
### Conspiracy
### (18 U.S.C. § 371)

Introduction

1.     The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-l, *et seq.* ("FCPA"), prohibited certain classes of persons and entities from corruptly making payments to foreign government officials to assist in obtaining or retaining business.  Specifically, the FCPA prohibited certain companies and individuals from willfully making use of any means or instrumentality of interstate

commerce corruptly in furtherance of an offer, payment, promise to pay, or

authorization of the payment of money or anything of value to any person, while

knowing that all or a portion of such money or thing of value would be offered,

given, or promised, directly or indirectly, to a foreign official to influence the

foreign official in his or her official capacity, induce the foreign official to do or

omit to do an act in violation of his or her lawful duty, or to secure any improper

advantage in order to assist in obtaining or retaining business for or with, or

directing business to, any person.

Relevant Persons and Entities

2.      Corporation A was a corporation headquartered and incorporated in

Switzerland.  Corporation A had sponsored American Depositary Shares ("ADSs")

publicly traded on the New York Stock Exchange.  Corporation A issued and

maintained a class of publicly-traded securities registered pursuant to Section

12(g) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and was required

to file periodic reports with the United States Securities and Exchange

Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).

Accordingly, Corporation A was an "issuer" within the meaning of the Foreign

Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a).

3.      Subsidiary A was a subsidiary of Corporation A and was incorporated

2

under the laws of the State of Delaware. Subsidiary A was a "domestic concern" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1). Subsidiary A conducted business, in part, through a business unit that had its principal place of business in Sugar Land, Texas ("Texas Business A"), which was acquired in or around January 1999. Texas Business A's primary business was to provide products and services to electrical utilities for network management in power generation, transmission, and distribution. Many of Texas Business A's clients were foreign state-owned utilities. Texas Business A conducted business in a number of its foreign markets through sales representatives.

4.      The defendant, **JOHN JOSEPH O'SHEA**, was the General Manager of Texas Business A and oversaw its operations both before and after its acquisition by Subsidiary A. Among **O'SHEA**'s responsibilities was approving payments to sales representatives. **O'SHEA** was a citizen of the United States. In light of the foregoing, **O'SHEA** was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

5.      Comisión Federal de Electricidad ("CFE") was an electric utility company owned by the United Mexican States ("Mexico") responsible for supplying electricity to all of Mexico other than Mexico City. CFE contracted

3

with Mexican and foreign companies for goods and services to help it perform its mission. CFE did business with Texas Business A.

6.     CFE Officials N, J, C, and G held official positions at CFE and had influence over decisions concerning Texas Business A's contracts with CFE. CFE Officials N, J, C, and G were "foreign officials" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

7.     Mexican Company X was a Mexican company headquartered in Mexico City, Mexico. The principal business of Mexican Company X was to be a sales representative for foreign and domestic companies doing business with Mexican government agencies. Mexican Company X was Texas Business A's sales representative in Mexico pursuant to representative agreements, and Texas Business A was Mexican Company X's most important customer. In light of the foregoing, Mexican Company X was an agent of a domestic concern, as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

8.     Texas Business A and Mexican Company X entered into multiple commission-based representation agreements in which Texas Business A agreed to pay Mexican Company X a percentage of the revenue generated from business with Mexican governmental utilities, including CFE. Texas Business A obtained multiple contracts with CFE for goods and services related to CFE's network

4

while using Mexican Company X as its sales representative. In or around December 1997, CFE awarded Texas Business A a contract referred to as the SITRACEN Contract (using the Spanish language acronym for Real Time Information and Control System). The purpose of this contract was to significantly upgrade the backbone of Mexico's electrical network system. The SITRACEN Contract generated over $44 million dollars in revenue for Texas Business A. In or around October 2003, CFE awarded Texas Business A a multi-year contract for maintenance and upgrades of the SITRACEN Contract, referred to as the Evergreen Contract. The Evergreen Contract, a sole source award, generated over $37 million in revenue for Texas Business A.

9.     FERNANDO MAYA BASURTO was a citizen of Mexico. BASURTO was a principal of Mexican Company X, performed work for Texas Business A on its contracts with CFE, and had primary responsibility at Mexican Company X for the Evergreen Contract. In light of the foregoing, BASURTO was an agent of a domestic concern, as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

10.     Co-conspirator X was a citizen of Mexico. Co-conspirator X founded and was a principal of Mexican Company X and also performed work for Texas Business A on its contracts with CFE. In light of the foregoing, Co-conspirator X

was an agent of a domestic concern, as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

11.    Intermediary Company O was a company incorporated in and headquartered in Mexico. Intermediary Company O maintained a bank account in Mexico. Intermediary Company O was paid by Texas Business A in connection with the Evergreen Contract, purportedly to perform maintenance support and administration. In light of the foregoing, Intermediary Company O was an agent of a domestic concern, as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

12.    Intermediary Company S was a company incorporated in Panama and headquartered in Mexico. Intermediary Company S maintained bank accounts in Germany and Switzerland. Co-conspirator S was the President and Executive Director of Intermediary Company S and a Mexican citizen. Intermediary Company S was paid by Texas Business A in connection with the Evergreen Contract purportedly to perform technical support. Intermediary Company S had previously also been paid by Texas Business A during the SITRACEN Contract. In light of the foregoing, Intermediary Company S and Co-conspirator S were agents of a domestic concern, as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

### The Conspiracy and Its Objects

13.    From in or before December 1997, through in or after November
2005, in the Southern District of Texas, and elsewhere, the defendant,

**JOHN JOESPH O'SHEA,**

did unlawfully, willfully, and knowingly conspire, confederate, and agree with
FERNANDO MAYA BASURTO, Subsidiary A, Texas Business A, Mexican
Company X, Co-conspirator X, Intermediary Companies O and S, Co-conspirator
S, and other persons known and unknown to the Grand Jury, to commit offenses
against the United States, that is:

(a) to willfully make use of the mails and means and instrumentalities of
interstate commerce corruptly in furtherance of an offer, payment, promise to pay,
and authorization of the payment of any money, offer, gift, promise to give, and
authorization of the giving of anything of value to any foreign official, or any
person, while knowing that a portion of such money and thing of value will be
offered, given, and promised, directly and indirectly, to any foreign official, for
purposes of: (i) influencing acts and decisions of such foreign official in his
official capacity; (ii) inducing such foreign official to do and omit to do acts in
violation of the lawful duty of such official; (iii) securing an improper advantage;
and (iv) inducing such foreign official to use his influence with a foreign

7

government and instrumentalities thereof to affect and influence acts and decisions

of such government and instrumentalities in order to assist the defendant,

**O'SHEA**, along with BASURTO, Subsidiary A, Texas Business A, Mexican

Business X, Co-conspirator X, Intermediary Companies O and S, Co-conspirator S

and others known and unknown to the Grand Jury, in obtaining and retaining

business for and with, and directing business to Subsidiary A and Texas Business

A, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code,

Sections 78dd-1, *et seq.*;

(b) to knowingly transport, transmit, and transfer and to willfully cause

others to transport, transmit, and transfer monetary instruments and funds from a

place in the United States to a place outside of the United States, intending that

each of the transactions, in whole and in part, promote the carrying on of a

specified unlawful activity, that is, a felony violation of the Foreign Corrupt

Practices Act, Title 15, United States Code, Sections 78dd-1, *et seq.*, in violation

of Title 18, United States Code, Section 1956(a)(2)(A); and

(c) to knowingly alter, destroy, mutilate, conceal, cover up, falsify, and

make a false entry in any record, document, and tangible object with the intent to

impede, obstruct, and influence the investigation or proper administration of any

matter within the jurisdiction of any department and agency of the United States

8

and in relation to and in contemplation of any such matter or case, in violation of Title 18, United States Code, Section 1519.

Purposes of the Conspiracy

14.     The purpose of the conspiracy was for **O'SHEA** and his co-conspirators to unjustly enrich themselves by making concealed corrupt payments to CFE Officials N, J, C, and G, and others in exchange for business advantages to Subsidiary A and Texas Business A, including the award of contracts.  It was further a purpose of the conspiracy for **O'SHEA** and his co-conspirators to further their bribery scheme by making international wire transfers.  Finally, it was a purpose of the conspiracy to falsify documents in order to conceal the existence of the conspiracy and to obstruct investigations by the Department of Justice and the Securities and Exchange Commission.

Manner and Means of the Conspiracy

15.     **O'SHEA**, along with BASURTO, Subsidiary A, Texas Business A, Mexican Business X, Co-conspirator X, Intermediary Companies O and S, Co-conspirator S, and others used the following manner and means, among others, to accomplish the objects and purposes of the conspiracy:

9

*The Agreement to Make Corrupt Payments for the SITRACEN Contract*

a.      CFE officials would inform **O'SHEA**, BASURTO, Co-conspirator X,

and others that corrupt payments would need to be paid in order to receive the

SITRACEN Contract. **O'SHEA** would authorize Texas Business A to make

corrupt payments for the benefit of CFE officials through the use of Intermediary

Company S. **O'SHEA** would also authorize BASURTO and Co-conspirator X to

make corrupt payments to CFE Official J on Texas Business A's behalf for the

SITRACEN Contract. BASURTO and certain of his family members would make

these payments in the form of checks to family members of CFE Official J.

*The Agreement to Make Corrupt Payments for the Evergreen Contract*

b.      In anticipation of future business based on the success of the

SITRACEN Contract, **O'SHEA**, BASURTO, Co-conspirator X, and CFE Officials

N and C would meet to discuss how to make corrupt payments to CFE Officials N

and C, as well as others at CFE, in order to secure the Evergreen Contract and

cause the inclusion of terms favorable to Texas Business A. The conspirators

would agree that the CFE officials collectively would receive approximately 10%

of the revenue from the CFE contract to distribute among themselves and others.

c.      The conspirators would further agree that Mexican Company X

would serve as an intermediary company for approximately one million dollars of

10

the corrupt payments over the course of the Evergreen Contract, with BASURTO and Co-conspirator X retaining a portion of these funds for themselves for their efforts. **O'SHEA** would cause Texas Business A to wire transfer funds to BASURTO and his family members for this purpose. BASURTO would follow instructions from CFE officials about how to then transfer the funds for the CFE officials' benefit. The conspirators would refer to this portion of the corrupt payments as the "extra for the friends that we handle" and payments to the "Good Guys."

       d.    The conspirators would further agree that the CFE officials would submit false invoices to Texas Business A from companies that did not do any work for Texas Business A to conceal the remaining portion of the corrupt payments. CFE officials would then select Intermediary Companies O and S to receive these funds from Texas Business A. BASURTO would receive the false invoices from CFE Official C in the names of Intermediary Companies O and S and then would transmit them to Texas Business A for payment. The conspirators sometimes referred to these payments as the "Third World Tax."

       e.    **O'SHEA**, BASURTO, and Co-conspirator X would make, use, and email charts and spreadsheets that reflected the "Good Guys" and "Third World Tax" or "3WT" payments.

*Transferring the Corrupt Payments*

f.     The conspirators would employ a series of financial transactions to conceal the origin and the ultimate recipients of the corrupt payments.

i.     BASURTO would direct that Texas Business A's payments to the "Good Guys" be broken up into a series of smaller payments that would then be wired to accounts at U.S. banks in the name of BASURTO and certain of his family members.

ii.     BASURTO would maintain control over all of these funds and would, at CFE Official C's instruction, wire funds from these accounts to a Merrill Lynch brokerage account. CFE Official C would then cause some of these funds to be further transferred to the son-in-law of CFE Official N and to the brother of CFE Official C. BASURTO would follow additional instructions from CFE Official C concerning the "Good Guys" funds, including giving CFE Official C approximately $20,000 in cash.

iii.     **O'SHEA** would approve payment on the false invoices received from BASURTO in the names of Intermediary Companies O and S, knowing their corrupt purpose. Texas Business A would then purport to pay these false invoices by wire transfer to accounts in the Federal Republic of Germany ("Germany") and Mexico.

12

*Benefits from the Corrupt Payments*

g.     Texas Business A would receive a variety of business advantages from CFE including, but not limited to, obtaining the SITRACEN and Evergreen Contracts from CFE and securing favorable terms in the Evergreen Contract.

*Compensation and Kickbacks*

h.     BASURTO and Co-conspirator X's compensation from Texas Business A for Mexican Company X's work would vary, but they would typically receive approximately 9% of the value of the SITRACEN and Evergreen Contracts for both the legitimate services they performed on the contracts as well as the illegal services they provided as conduits for corrupt payments.

i.     BASURTO and Co-conspirator X would also make kickback payments out of their commissions to **O'SHEA**. These kickback payments would be made in a concealed fashion by writing checks to multiple payees, including **O'SHEA**, his family members, a friend, and American Express to pay **O'SHEA**'s credit card bills. To further conceal the payments to **O'SHEA**, BASURTO would use multiple accounts to make these payments. At times, **O'SHEA** would also receive kickback payments in cash.

13

*The Cover Up*

j.     After **O'SHEA** was terminated from Texas Business A, **O'SHEA**,

BASURTO, Intermediary Companies O and S, Co-conspirator S, CFE Officials N,

C, and G, and others would begin a cover up to conceal the illegal nature of these

payments and would continue their obstructive conduct after learning that

Corporation A had disclosed suspected corrupt payments made by Subsidiary A

through Texas Business A to the Department of Justice, the Securities and

Exchange Commission's Enforcement Division, and the Mexican authorities. This

included, but was not limited to, the following:

i.     **O'SHEA**, BASURTO, and CFE Officials C and G would

create fake, back-dated correspondence that purported to show the history of

Texas Business A's relationships with Intermediary Companies O and S and the

work that these companies had allegedly performed for Texas Business A. They

would then obtain genuine signatures on the fake documents from **O'SHEA**, CFE

Official G, Co-conspirator S, and others. The conspirators would take care not to

send electronic copies of these documents to those outside of the conspiracy to

help conceal the true dates that would be revealed in the documents' metadata;

ii.     BASURTO and CFE Officials C and G would create false

documentation purporting to substantiate the work Intermediary Companies O and

14

S claimed to have performed. For example, BASURTO, with the help of CFE Officials C and G, plagiarized studies previously conducted for CFE by a legitimate outside consultant and made them appear to have been authored by Intermediary Company S; and

        iii.    Official C and others created false documentation purporting to show that the payments made to the Merrill Lynch bank account were part of an investment in real estate.

Overt Acts

16.    In furtherance of the conspiracy and to achieve the objects and purposes thereof, the co-conspirators committed, or caused to be committed, in the Southern District of Texas and elsewhere, the following overt acts, among others:

*Corrupt Payments for the "Good Guys"*

a.    On or about February 2, 2004, BASURTO sent an email to **O'SHEA** referring to payments from Texas Business A to Mexican Company X, including those intended to be corrupt payments, that read, in part, "This is the transfer arrangement for the bonus portion we are handling. It is the same amount shown in the table you have, the first two figures under the Good Guys column."

b.    On or about May 7, 2004, BASURTO sent an email to **O'SHEA** discussing corrupt payments Mexican Company X was responsible for transferring

15

that read, in part, "We have already informed [CFE Officials N and C] that you are not coming the 11th. . . . Regarding the numbers we handle for them, we will need a transfer of US$42,344."

c.     On or about May 11, 2004, BASURTO sent an email to **O'SHEA** regarding the latest requested corrupt payment that read, in part, "This 42k is for the extra we handle for our friends."

d.     On or about July 23, 2004, BASURTO sent an email to **O'SHEA** explaining which portion of Mexican Company X's commissions was for services and which was for corrupt payments, which read, in part, "Commission 3 is the extra bonus for our friends that we handle."

e.     On or about the following dates, **O'SHEA** caused Texas Business A to wire transfer the following amounts to various accounts controlled by BASURTO as corrupt payments for the "Good Guys":

|      | Approximate Date  | Approximate Amount | To                              | Bank                | Account |
|------|-------------------|--------------------|---------------------------------|---------------------|---------|
| i.   | February 17, 2004 | $30,000            | Family Member of BASURTO        | Bank of America     | xx543   |
| ii.  | February 17, 2004 | $30,000            | Family Member of BASURTO        | Bank of America     | xx569   |

16

| iii. | February 17, 2004 | $30,000 | BASURTO | Wells Fargo | xx010 |
|------|-------------------|---------|---------|-------------|-------|
| iv. | February 17, 2004 | $30,000 | Family Member of BASURTO | JP Morgan Chase | xx065 |
| v. | February 17, 2004 | $30,000 | Family Member of BASURTO | Bank of America | xx519 |
| vi. | February 17, 2004 | $31,750 | BASURTO | Bank of America | xx414 |
| vii. | May 13, 2004 | $42,343 | Family Member of BASURTO | Bank of America | xx772 |
| viii. | September 27, 2004 | $42,342 | Family Member of BASURTO | Bank of America | xx772 |

f.   On or about the following dates at the direction of CFE Official C, BASURTO caused the following wire transfers to be made to a shell Merrill Lynch brokerage account held in the name of a third party out of the "Good Guys" funds:

| | Approximate Date | Approximate Amount | Bank | Account |
|---|------------------|--------------------|------|---------|
| i. | February 20, 2004 | $22,500 | Bank of America | xx519 |
| ii. | February 20, 2004 | $22,500 | Bank of America | xx543 |
| iii. | February 23, 2004 | $22,500 | Bank of America | xx569 |

| iv. | February 23, 2004 | $22,500 | Bank of America | xx513 |
| v. | February 23, 2004 | $45,000 | Bank of America | xx519 |
| vi. | May 14, 2004 | $30,831 | Bank of America | xx772 |
| vii. | October 4, 2004 | $31,750 | Bank of America | xx772 |

g.    On or about the following dates, CFE Official C caused the following wire transfers to be made from the same shell Merrill Lynch brokerage account to an account in the name of the son-in-law of CFE Official N:

|  | Approximate Date | Approximate Amount |
| --- | --- | --- |
| i. | February 26, 2004 | $68,159 |
| ii. | May 21, 2004 | $15,878 |
| iii. | October 14, 2004 | $15,875 |

h.    On or about June 21, 2004, CFE Official C caused a wire transfer of approximately $2,000 to be made from the same Merrill Lynch brokerage account to a Mexican bank account in the name of the brother of CFE Official C.

*Corrupt Payments to Intermediary Companies O and S*

i.    In or around March 2004, BASURTO transmitted an invoice to Texas Business A on behalf of Intermediary Company O that had been given to him by CFE Official C, which falsely requested payment for "6 MONTHS (7-12/2003)

18

OF MAINTENANCE SUPPORT SERVICES AND ADMINISTRATION OF CFE

EVERGREEN PROJECT AT ALL SITES IN MEXICO" and requested payment

of $327,000.

    j.    In or around May 2004, BASURTO transmitted an invoice to Texas

Business A on behalf of Intermediary Company O that had been given to him by

CFE Official C, which falsely requested payment for "4 MONTHS OF

MAINTENANCE SUPPORT SERVICES AND ADMINISTRATION OF CFE

EVERGREEN PROJECT AT ALL SITES IN MEXICO" and requested payment

of $76,200.

    k.    On or about the following dates, **O'SHEA** caused Texas Business A

to wire transfer the following amounts to Intermediary Company O's Mexican

bank account:

|  | Approximate Date | Approximate Amount |
|---|---|---|
| i. | March 8, 2004 | $327,000 |
| ii. | June 3, 2004 | $76,200 |

    l.    On or around March 2004, BASURTO transmitted an invoice to Texas

Business A on behalf of Intermediary Company S and signed by Co-conspirator S

that had been given to him by CFE Official C, which falsely requested payment for

19

"Technical support for 6 months" and requested that $218,000 be sent to a German bank account.

     m.    On or around May 2004, BASURTO transmitted an invoice to Texas Business A on behalf of Intermediary Company S and signed by Co-conspirator S that had been given to him by CFE Official C, which falsely requested payment for "Technical support for 4 months" and requested that $50,800 be sent to a German bank account.

     n.    On or about the following dates, **O'SHEA** caused Texas Business A to wire transfer the following amounts to Intermediary Company S's German bank account:

|      | Approximate Date | Approximate Amount |
| ---- | ---------------- | ------------------ |
| i.   | April 1, 2004    | $218,000           |
| ii.  | June 3, 2004     | $50,800            |

     o.    On or about the following dates, Co-conspirator S caused the following wire transfers to be made to the U.S. bank account of a military academy to pay for the tuition of CFE Official N's son:

|      | Approximate Date | Approximate Amount |
| ---- | ---------------- | ------------------ |
| i.   | April 5, 2004    | $24,500            |
| ii.  | June 4, 2004     | $5,000             |

*The Cover Up*

p.    On or about October 23, 2004, **O'SHEA** sent BASURTO a draft, fake

contract between Texas Business A and Intermediary Company O, backdated to

November 1, 2003, as an attachment to an email that stated, in part, "we must

make sure we never deliver or email electronic copies of any of these documents

to anyone ([Corporation A]) as they would see the dates in the edits."

q.    On or about November 25, 2004, **O'SHEA** sent BASURTO an email

with suggested text for fake, backdated correspondence concerning Intermediary

Company O, that stated, in part, "We must also agree [Mexican Company X]

would have been delivering these letters within Mexico on [Texas Business A's]

stationery, as [the assistant] kept copies of all my incoming and outgoing

correspondence (letters, faxes, etc.) and these won't be in those files."

r.    On or about November 27, 2004, **O'SHEA** sent BASURTO an email

with suggested text for fake, backdated correspondence concerning Intermediary

Companies O and S "for discussion with [CFE Official C]."

s.    On or about March 5, 2005, BASURTO emailed CFE Official G a

copy of a plagiarized study he was altering to make it appear that it was

Intermediary Company S's work.

21

t.      On or about April 12, 2005, **O'SHEA** sent BASURTO an email that read, in part, "I didn't return your call yesterday because I have been advised to be careful about who I talk to on the phone and what I say. I will try and call tomorrow on a pay phone but we should probably meet in person at your earliest convenience."

u.      On or about April 27, 2005, **O'SHEA** sent BASURTO an email that read, in part, "It seems my lawyer thinks it is OK to use a private email such as yahoo, as it would be much more difficult for anyone to get the exchanges - if it is a company email it belongs to them. I beleive [sic] we should alter opur [sic] normal routine; meaning not meet at the 'eggs benedict' place."

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH THIRTEEN
### Violations of the Foreign Corrupt Practices Act
### (15 U.S.C. §§ 78dd-2(a); 18 U.S.C. § 2)

17.     Paragraphs 1 though 12, and 14 through 16 of Count One are realleged and incorporated by reference as though set forth herein.

18.     On or about the dates set forth below, in the Southern District of Texas, and elsewhere, the defendant,

### JOHN JOSEPH O'SHEA,

who was a domestic concern and an officer, employee, and agent of a domestic concern within the meaning of the FCPA, willfully made use of and caused others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money and thing of value will be offered, given, and promised, directly and indirectly, to any foreign official for the purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist the defendant, **O'SHEA**, as well as BASURTO, Co-conspirator X, Subsidiary A, Texas Business A, and others known and unknown to the Grand Jury in obtaining and retaining business for and with, and directing business to Subsidiary A and Texas Business A, as follows:

23

| Count | Approximate Date | Use of Instrumentality of Interstate Commerce | CFE Contract |
|-------|-----------------|-----------------------------------------------|--------------|
| Two | February 17, 2004 | "Good Guys" corrupt payment of $30,000 wire transferred from Texas Business A's bank account to a Bank of America account ending xx543 in the name of one of BASURTO's family members | Evergreen Contract |
| Three | February 17, 2004 | "Good Guys" corrupt payment of $30,000 wire transferred from Texas Business A's bank account to a Bank of America account ending xx569 in the name of one of BASURTO's family members | Evergreen Contract |
| Four | February 17, 2004 | "Good Guys" corrupt payment of $30,000 wire transferred from Texas Business A's bank account to a Wells Fargo account ending xx010 in the name of BASURTO | Evergreen Contract |
| Five | February 17, 2004 | "Good Guys" corrupt payment of $30,000 wire transferred from Texas Business A's bank account to a JP Morgan Chase account ending xx065 in the name of one of BASURTO's family members | Evergreen Contract |
| Six | February 17, 2004 | "Good Guys" corrupt payment of $30,000 wire transferred from Texas Business A's bank account to a Bank of America account ending in xx519 in the name of one of BASURTO's family members | Evergreen Contract |

| Seven | February 17, 2004 | "Good Guys" corrupt payment of $31,750 wire transferred from Texas Business A's bank account to a Bank of America account ending in xx414 in the name of one of BASURTO | Evergreen Contract |
|---|---|---|---|
| Eight | March 8, 2004 | "Third World Tax" corrupt payment of $327,000 wire transferred from Texas Business A's bank account to Intermediary Company O's Mexican bank account | Evergreen Contract |
| Nine | April 1, 2004 | "Third World Tax" corrupt payment of $218,000 wire transferred from Texas Business A's bank account to Intermediary Company S's German bank account | Evergreen Contract |
| Ten | May 13, 2004 | "Good Guys" corrupt payment of $42,343 wire transferred from Texas Business A's bank account to a Bank of America account ending xx772 in the name of one of BASURTO's family members | Evergreen Contract |
| Eleven | June 3, 2004 | "Third World Tax" corrupt payment of $76,200 wire transferred from Texas Business A's bank account to Intermediary Company O's Mexican bank account | Evergreen Contract |

| Twelve | June 3, 2004 | "Third World Tax" corrupt payment of $50,800 wire transferred from Texas Business A's bank account to Intermediary Company S's German bank account | Evergreen Contract |
| Thirteen | September 27, 2004 | "Good Guys" corrupt payment of $42,342 wire transferred from Texas Business A's bank account to a Bank of America account ending xx772 in the name of one of BASURTO's family members | Evergreen Contract |

All in violation of Title 15, United States Code, Sections 78dd-2(a) and Title

18, United States Code, Section 2.

## COUNTS FOURTEEN THROUGH SEVENTEEN
### International Money Laundering
### (18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2)

19.     Paragraphs 1 though 12, and 14 through 16 of Count One are

realleged and incorporated by reference as though set forth herein.

20.     On or about the following dates, in the Southern District of Texas,

and elsewhere, the defendant,

## JOHN JOSEPH O'SHEA,

and others, known and unknown to the Grand Jury, knowingly transported

transmitted, and transferred, and willfully caused others to transport, transmit, and

transfer, the following monetary instruments and funds from a place in the United

States, namely the Southern District of Texas, to the following places outside the

United States, intending that each of the transactions, in whole and in part,

promote the carrying on of a specified unlawful activity, that is, a felony violation

of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq.*:

| Count | Approximate Date | Foreign Place | Financial Transaction |
|---|---|---|---|
| Fourteen | March 8, 2004 | Mexico | Wire transfer of approximately $327,000 from Texas Business A's bank account to Intermediary Company O's Mexican bank account |
| Fifteen | April 1, 2004 | Germany | Wire transfer of approximately $218,000 from Texas Business A's bank account to Intermediary Company S's German bank account |
| Sixteen | June 3, 2004 | Mexico | Wire transfer of approximately $76,200 from Texas Business A's bank account to Intermediary Company O's Mexican bank account |
| Seventeen | June 3, 2004 | Germany | Wire transfer of approximately $50,800 from Texas Business A's bank account to Intermediary Company S's German bank account |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and

2.

**COUNT EIGHTEEN**
**Falsification of Records in a Federal Investigation**
**(18 U.S.C. § 1519; 18 U.S.C. § 2)**

21.     Paragraphs 1 though 12, and 14 through 16 of Count One are

realleged and incorporated by reference as though set forth herein.

22.     From approximately on or about October 23, 2004, through

approximately on or about October 18, 2005, in the Southern District of Texas,

and elsewhere, the defendant,

**JOHN JOSEPH O'SHEA,**

and others, known and unknown to the Grand Jury, did knowingly alter, destroy,

mutilate, conceal, cover up, falsify and make a false entry in records, documents,

and tangible objects with the intent to impede, obstruct, and influence the

investigation and proper administration of any matter within the jurisdiction of any

department or agency of the United States, that is, the Department of Justice and

the Securities and Exchange Commission, and in relation to and contemplation of

any such matter and case, in that **JOHN JOSEPH O'SHEA** knowingly created

and caused to be created false documents pertaining to Texas Business A's

relationship with Intermediary Companies O and S.

        All in violation of Title 18, United States Code, Sections 1519 and 2.

28

## NOTICE OF FORFEITURE

23.   The violations alleged in Counts One through Eighteen of this Indictment are realleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America of property in which the defendant has an interest.

24.   Upon conviction of any of the offenses alleged in Counts One through Thirteen of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to said offense(s).

25.   Upon conviction of any of the offenses alleged in Counts Fourteen through Seventeen of this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense or any property traceable to such property.

26.   The property subject to forfeiture includes but is not limited to:

a.   $2,030,076.74 in United States currency, representing the amount of proceeds derived from the conspiracy alleged in Count One;

b.   $938,436 in United States currency, representing the amount of proceeds constituting or derived from the offenses alleged in Counts Two through Thirteen;

   c. all money or other property that was the subject of each

transaction, transportation, transmission, or transfer, in violation of Title 18,

United States Code, Section 1956;

   d. all commissions, fees and other property constituting proceeds

obtained as a result of a violation of Title 18, United States Code, Section 1956;

   e. all property used in any manner or part to commit or to

facilitate the commission of a violation Title 18, United States Code, Section

1956; and

   f. all property traceable to the money or other property subject to

forfeiture under subparagraphs c, d, and e above.

*Substitute Asset Provision*

 21. If any of the above-described forfeitable property, as a result of any

act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be

divided without difficulty;  it is the intent of the United States to seek forfeiture of

any other property of said defendant up to the value of the forfeitable property described above.

27.    If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount derived from such offense.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable hereto by Title 28, United States Code, Section 2461; Title 18, United States Code, Sections 982(a)(1) and (b)(2), and the procedures outlined at Title 21, United States Code, Section 853, and set forth in Fed. R. Crim. P. 32.2.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

TIM JOHNSON
UNITED STATES ATTORNEY

STEVEN A. TYRRELL, CHIEF
MARK F. MENDELSOHN, DEPUTY CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By:    Nicola J. Mrazek
Trial Attorney

31

Public and unofficial staff access
to this instrument are
prohibited by court order.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA

v.

JOHN JOSEPH O'SHEA

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

CRIMINAL NO:

# H-09- 629

## ORDER FOR ISSUANCE OF BENCH WARRANT

A    CRIMINAL INDICTMENT    has been returned against the defendant listed

below.

It is ORDERED that a warrant be issued for the arrest of said defendant.  Upon arrest and

appearance, a judicial determination shall be made as to detention or release on conditions.  The

United States Government recommends to the Court the following:

Defendant

JOHN JOSEPH O'SHEA
1630 Laguna Hills Lane
Pleasanton, CA 94566

☐ DETENTION

☐ RELEASED ON CONDITIONS

☒ APPEARANCE BOND IN THE
   AMOUNT OF: $ 50,000

SIGNED at Houston, Texas, on   _November 16_ , 20 _09_ .

_Gae. Bdley_
UNITED STATES MAGISTRATE JUDGE

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

United States of America

v.

John Joseph O'Shea

*Defendant*

) 
) 
) 
) 
)

Case No.    4:09CR629 ░░░░░░░░░░░

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    John Joseph O'Shea

who is accused of an offense or violation based on the following document filed with the court:

X Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☐ Complaint

☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    Order of the Court

This offense is briefly described as follows:

Ct:1 Conspiracy [18 usc 371}
Cts. 2-13 Violation of the FCPA [15 usc 78dd-2(a)18usc2]
Cts 14-17 International Money Laundering [18 usc 1956(a)(A) 18 usc2]
Ct . 18 Falsification of Records in a Federal Investigation [18 usc 1959 18 usc2]

Date:  November 17, 2009

_____
*Issuing officer's signature*

City and state:   Houston, Texas

M.Mapps, Deputy Clerk
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____     _____ *Arresting officer's signature* |
|     _____ *Printed name and title* |

AO 442 (Rev. 01/09) Arrest Warrant (Page 2)

AO257
(USAO Rev. 6/99)                    **Marshal's Office/Clerk's Office**                    PER 18 U.S.C. 3170

| **DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT** | | |
|---|---|---|

**BY:** ☐ Complaint   ☐ Information   ☑ Indictment          **DEFENDANT · U.S. · vs.**

| Name of District Court, and/or Judge/Magistrate Location (City) | JOHN JOSEPH O'SH... **H – 09 – 629** |
|---|---|

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

1630 Laguna Hills Lane
Pleasanton, CA. 94566.

Name and Office of Person
Furnishing Information on
THIS FORM        TIM JOHNSON, USA prohibited by court order        02/16/1952        ☑ Male   ☐ Alien
☑ U.S. Att'y   ☐ Other U.S. Agency                                                      ☐ Female   (if applicable)

Name of Asst. U.S. Att'y
(if assigned)    NICOLA MRAZEK, DOJ Trial Atty        Social Security Number        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

| **Proceeding** | **Defendant** |
|---|---|

Name of Complainant Agency, or Person (& Title, if any)

Kendall Hopper, FBI

**IS NOT IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding
   if not detained give date any prior ▶
   summons was served on above charges

☐ person is awaiting trial in another Federal or State Court, give
   name of court

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

☐ this person/proceeding transferred from another district per (circle
   one) FRCrP 20, 21 or 40. Show District

**IS IN CUSTODY**

4) ☐ On this charge
5) ☐ On another conviction                    } ☐ Fed'l   ☐ State
6) ☐ Awaiting trial on other charges

☐ this is a reprosecution of charges
   previously dismissed which were
   dismissed on motion of:          **SHOW**
   ☐ U.S. Att'y   ☐ Defense        **DOCKET NO.**

If answer to (6) is "Yes", show name of institution

☐ this prosecution relates to pending
   case involving this same defendant

☐ prior proceedings or appearance(s)    **MAG. JUDGE**
   before U.S. Magistrate Judge regarding  **CASE NO.**
   this defendant were recorded under

Has detainer   ☐ Yes        If "Yes"
been filed?    ☐ No      }  give date
                              filed

**DATE OF**
**ARREST**    ▶

Place of      Southern District of Texas     ☐ Petty
offense                                       ☐ Minor        Or . . . if Arresting Agency & Warrant were not Federal
                                             ☐ Misdemeanor   **DATE TRANSFERRED**
                                             ☑ Felony        **TO U.S. CUSTODY**

☐ This report amends previous AO257 submitted

| **OFFENSE CHARGED - U.S.C. CITATION -STATUTORY MAXIMUM PENALTIES - ADDITIONAL INFORMATION OR COMMENTS** |
|---|

Ct. 1: Conspiracy [18 USC § 371]

Cts. 2-13: Violation of the FCPA [15 USC § 78dd-2(a); 18 USC § 2]

Cts. 14-17: International Money Laundering [18 USC § 1956(a)(2)(A); 18 USC § 2]

Ct. 18: Falsification of Records in a Federal Investigation [18 USC § 1959; 18 USC § 2]

**Penalties**

Ct. 1: 5 years imprisonment, $250,000 fine or 2x profits or losses, 3 years S/R, and $100 S/A.

Cts. 2-13: 5 years imprisonment,$100,000 fine or 2x profits or losses, 3 years S/R, and a $100 S/A.

Cts. 14-17: 20 years imprisonment, $500,000 fine or twice the value of the property involved in the transaction, 3 years S/R, and a $100 S/A.

Ct. 18: 20 years imprisonment, $250,000 fine or 2x profits or losses, 3 years S/R, and a $100 S/A.